Good morning, Counsel. Good morning. Pleased to see you, Counsel. Thank you. May it please the Court, I'm Michael Kirkpatrick. I represent the lot objectors, and I intend to reserve about four minutes for rebuttal. The District Court erred in finding this settlement fair, reasonable, and adequate, as required by Rule 23e, we think, for four main reasons. The first is that the Court could not properly determine the fairness of the settlement because it lacked information regarding the value of the claims surrendered. And without knowing the range of damages that would be recoverable in successful litigation, the Court abused its discretion in finding that the settlement was a reasonable compromise. Second, the Court did not determine the value of the settlement using a realistic claims rate. The only estimate of the settlement's value... Now, let me take the liberty of interrupting you on that point. Assuming you're right that accepting a 100% rate was not realistic, where in the record do we have the basis for determining what is the proper rate? All we have is case law. Cases that have found time and time again that a typical claims rate in a claims-made settlement is less than 10%. Now, there is some variation, and frankly, there's not a lot of case law on it, because ordinarily these claims rates, the only people that know about them are the settling parties after the fact. And the settlement administrators are bound by confidentiality. They don't announce those. There is a trend now to require folks to come back and report what the claims rate was. But we don't have a ton of cases. But we've cited, I think, about six or seven that lay out claims rates. So the reason I'm raising this is so if we were to remand to the district court on that issue, how's the district court going to determine what's a reasonable claims rate? Well, at this point we will know if it is remanded, because remember, the deadline to file a claim was 180 days from approval. Approval was in October 2017. And so we're now about a year from the deadline. Now, I want to make clear, there is some elements of relief here that continue into the future, that people can become eligible for relief in the future. So we won't know that number. But we will know that as of the time of the settlement approval and 180 days after that, how many people have come forward and filed a claim. So that will be a very good indication, I think, of what kind of claims rate to expect. And I would just direct the court to the recent decision in My Ford Touch out of the Northern District of California, which was the subject of a 28-J letter that we put in about a week ago. And in that case, the parties settled, came in, and estimated the value of the settlement based on a 100 percent claims rate. Judge Chen expressed concern. They withdrew that settlement. They went back, negotiated further, and they came back and estimated that the claims rate would be 7 percent. And that is in line with much of what we see in the case law. So we think it was an abuse of discretion to make that unreasonable assumption of a 100 percent claims rate. And that was the only piece of information that estimated the value. And so right there, I think you have to take it down by a pretty large percentage. The third point that I wanted to make is that the distribution of relief among the class is unfair because most class members get nothing. Remember that at the time of this fairness hearing, 94 percent of the class was not eligible for any relief at all. Furthermore, there were at least 400,000 former members at that point, and they get nothing. And we also know that people are sacrificing claims of high value. For example, in California, we know that Ford routinely offers to settle these cases for $75,000 or more. We know that there is a damages expert who predicted that one of these cases could settle for as much as $215,000. And there's been only one case that has gone to judgment, and we put in a 28-J letter on this. And in that case, Ford agreed to pay full buyback and double that in civil penalties for a total of $132,000. And then they went forward and they had a jury trial on the fraud claim, and the jury came back with an additional $500,000. So those are three data points we have, that Ford is routinely offering $75,000. There is an expert declaration that says a single case could be worth about $215,000. And we have one judgment, and that one judgment was $632,000, not counting costs and attorney's fees. So these are not low-value claims, but what has happened here is Ford is purchasing Reyes-Duticata for a very low price. And that's one of the things that's wrong here. Now, we understand that you can't necessarily take individual results and extrapolate them out to 1.9 million class members. We understand that. All we're saying is these are data points that are relevant, and they are the only data points we have, because the settling parties put in nothing to explain the value of the claims released. The fourth point that I wanted to make is that the court failed to apply the higher level of scrutiny required when the three Bluetooth factors are present, as they were here. And I think that's an important point, because we are not attacking the attorney fee award directly and per se. What we're saying is this court in Bluetooth identified three warning signs that class counsel self-interest may have impacted the negotiations. Disproportionate fees relative to the value of the settlement, clear sailing, and reversion. All three are here. So that doesn't mean that it couldn't have been fair, but what it does mean is the district court was required to give it heightened scrutiny, and the district court didn't do that. The district court simply said, well, there is an estimate of $35 million as the value of the settlement, and that $9 million in fees, that seems to come in pretty close to our cross-check of 25%. Well, the problem there, again, is that $35 million estimate is based on a 100% claims rate. So we're not saying that there was some kind of explicit collusion. What we're saying is this is sort of structural collusion, that the parties independently operating in their own interest, sometimes it will cause unfairness to the absent class members. And that's what we think happened here. And the court needed to take a deeper dive given the presence of those Bluetooth factors. We think that the settlement really should have been judged by looking at the value of the settlement compared to the potential recovery if the litigation is successful, discounted for the risk of non-recovery. And that's really the essence of the Hanlon factors. And in the Second Circuit, we use the Grinnell factors, and I think they are overlapping. Just about every circuit has a group of factors that are non-exclusive, and not every factor will apply to every case. But all of them at bottom say you should look at the strength of the case and what you could win, and then you need to look at the risk of losing and the cost and how long it will take, and look at the amount of the settlement, and then make a judgment about whether this is a reasonable compromise. So that's the way we would do it in a single plaintiff case. If there was a settlement offer, we would tell our client, this is what we think the case might be worth, a range of recovery if we win, and these are the risks that we might lose or the jury might come in low, and here's the settlement that's on the table. Do we think this is fair? That's what should have been done here, but the court couldn't do it because nobody ever told the court what this case would be worth if the plaintiffs prevailed. And so there was no way to make that relational decision about fairness. I mentioned about the, you know, value of the claims released. We think they're very significant because of those data points that I talked about. With regard to the value of the cash payment provision of the settlement, again, the big problem there is with the claims rate. And so I think we have to take that $35 million figure and reduce it. And also, the claims rate is particularly important here because there's no guaranteed payout. This is a pure claims-made settlement, and that's the functional equivalent of a common fund with a reverter, and reversions, of course, are disfavored. And the claims here might even be lower than typical for a few reasons. First, class members who qualify for relief at the time of approval only had 180 days to file those claims. So that claims period has, you know, expired almost a year ago. The estimate also assumes that the qualifying vehicles had only one owner because, remember, each owner had to independently reach the threshold number of unsuccessful repair attempts in order to apply for the inconvenience payments. So a realistic estimate of the number of qualifying vehicles would need to adjust for that possibility. Also, the expert observed that if class vehicles that are one unsuccessful repair attempt away from qualifying for a cash payment reached that threshold, the value of the settlement would go up by $29 million. But again, that's assuming a 100% claims rate. So it's really important to just realize that at the time of the fairness hearing, at least 94% of the class vehicles lacked the requisite number of repair attempts to qualify for any cash payment at all. And it's not fair to require the release of damages claims for no consideration. I'd like to talk a little bit about the arbitration program. Because we don't really have any estimate of the value of buyback arbitration. Because the settling parties did not put in any evidence on that. They didn't ask an expert to opine about that. But there are several features of the program that show that it has minimal value to the class. And, in fact, it primarily benefits Ford. First, the program trades the litigation forum for the arbitration forum. That's one thing. But here, the class still has the burden of establishing an entitlement to buyback in arbitration. It's not like you go to arbitration, you automatically win. You still have to meet the standard either under your state lemon law or under the default standard that's in this settlement. But also, probably the big thing is the tradeoff here. Arbitration program bans every cause of action other than lemon law and every form of relief other than repurchase. So you can't pursue other causes of action. And remember, this case was never about lemon law. This case was about consumer fraud. This case was about breach of express and implied warranties. That's where the real value is. And that's what we're talking about when I talk about these cases in California that routinely are offered $75,000 from day one to settle. It's because of consumer fraud and the possibility of treble damages. It's because with these fraud claims, the exposure forehouse is astronomical. So what they're doing is they're trading what was a consumer fraud case and they're saying, but you can pursue lemon law relief. But only buyback, no civil money penalties. You can't have any discovery, no jury. Attorney's fees are capped at $6,000. Again, this sounds like a great out for Ford, which, again, is purchasing Reyes Judicata at a bargain price. I guess I'd like to turn then to the benefits of the settlement not being fairly distributed among the class. And that's a real problem, because as we said, you know, only 6% of the class is eligible for anything. More may become eligible in the future, but we have no evidence of how many that will be. You know, 6% qualify for a cash payment. Only 2% have the threshold to immediately pursue buyback arbitration. Former owners won't become eligible for anything in the future. And there are substantial differences in the remedies that are available under the various state consumer protection laws. And it's unfair to treat all class members the same when some are sacrificing so much more than others. Class members with different claims ought not receive the same relief. Now, the settling parties will argue that buyback is available in arbitration based on whatever lemon law standard applies in the class member's state, so it must be fair. That's the wrong analysis. What they've done is they've brought us down to the lowest common denominator of buyback. The relevant difference is what class members are surrendering, what they're giving up. And folks in some states are giving up much, much more than folks in other states. Finally, I just want to point out that opt out cannot cure unfairness. That seems to be what we always hear is, well, if you had a better claim, you could have opted out. Well, it's unrealistic to expect 400,000 former owners all to opt out rather than give up their claims for nothing. You know, opt out may work for the outliers who have particularly valuable claims. But here there are large, large parts of the class getting nothing. We can't expect them to opt out. And if opt out could cure unfairness, well, then we wouldn't have 23E. And the district court wouldn't have to act as a fiduciary to protect the absent class members. And if you gave notice... The whole premise of class actions is that opt out is not a meaningful remedy, yes? Exactly. Exactly. And so here it's no, you know, it's just not satisfying to say, well, those folks could have opted out if they didn't like this deal. No, it was the burden was on the settling parties to come forward and show the district court that this was a fair deal. They didn't put in the information that the court needed. And that's why the court abused its discretion. It did not have the information it needed. It made a unrealistic assumption about claims rates. It didn't give the higher level of scrutiny that Bluetooth indicates. And it didn't deal with the problem of differences in the value of the claims being surrendered by the different subgroups. The district court did go into great detail in terms of assessing the settlement. It wasn't an offhand evaluation. No, it wasn't. Well, it wasn't, but the problem was there was no information about the value of the case if it had been successful. And there was the unrealistic claims rate. But isn't the district court entitled to try to determine the value? I mean, there's not going to be specific evidence of the value. So isn't the district court called upon to try to assess the value to the best of its ability? Yes, but it couldn't do so here because it was not aided by the settling parties. Ordinarily you have a damages expert who, and it can be a range. We're not saying there has to be a formula that it's a specific number with mathematical precision. But ordinarily you would come in and you would say, judge, if we won this case, this is the range of recovery that we think is reasonable to expect, and here's the risk, and here's the value of the settlement. Is there a case that says absent an expert, the court abuses its discretion in assessing the damages amount? Not explicitly from the Ninth Circuit. Certainly there are cases that say that, and, you know, like the My Ford Touch that we just put in, the district court did. Right, but if the Ninth Circuit doesn't say it, how can we say it's an abuse of discretion for the district court to assess a damages amount without an expert if our precedent doesn't compel that? Well, he needed some information to rely on, and it's an abuse of discretion to omit a substantial factor. And a substantial factor is the value of the claims released. That was not analyzed because he didn't have the information. I would like to reserve my time if I may. Thank you, counsel. So it's my understanding that you two are splitting time. Yes, Your Honors. Ryan Wu for plaintiff, 10 minutes, and Jonathan Hacker for Ford. We'll have 10 minutes. All right. Thank you. So just addressing that first point about the claims, the amount of the claims surrendered. There are two Ninth Circuit cases directly on point, Rodriguez v. West and Lane v. Facebook, both of which expressly rejected the idea that the plaintiffs need to provide an exact valuation, a quantification of the value surrendered. So this record here premised most of its conclusions on a 100 percent claim rate. That is absurd. That is on its face, some might say, an abuse of discretion. Sorry, Judge Rakoff. I'd like to correct that misconception. That wasn't an 100 percent claims rate. I want to turn the Court's attention to the actual expert evaluation. Assuming, I do want to hear you very much on that, but assuming, contrary to what you're about to tell me, that the Court did assume a 100 percent claims rate, wouldn't that invalidate the approval of the settlement on its face? No, it wouldn't, Your Honor. Why not? So, for example, in Inway Online DVD, a binding Ninth Circuit case, there was a 3 percent claims rate in that case. The Court found that the case, that the settlement was fair and reasonable. Ninety-seven percent of the class members in that case did not receive anything. And that was fair and reasonable, a case from 2015, which we cited in our brief. Not for that proposition, but, you know, I think the precedence of this Court suggests that the claims rate  is 100 percent claims rate. But if we're talking about valuing the settlement, and it's based on an assumption of a 100 percent claims rate, why isn't that an abusive description? Let me go back to this idea, this fallacy that they have that this is a 100 percent claims rate. The value that Mr. Stockton provided isn't the full amount that the settlement would provide. The settlement actually, the settlement is uncapped. If you were to actually, if everyone were to actually submit a claim, it would be $4 billion just for the cash component alone. Because, you know, at a 100 percent claims rate and maximum number of service visits, it would go to $4 billion. So we're not talking, you know, we're comparing apples and oranges. What Mr. Stockton's report says is that 100,000 vehicles, which is about 5 percent of the class, already qualify for the hardware replacement payments. And an additional 140,000 have two repairs. We believe that when the notices went out, a lot of them would have gone to get the hardware repairs. So we're looking at something way beyond $35 million just for the hardware repairs alone. That number, again, is quantifying the number of cars that will be eligible for the repairs. And I want to step back a second just to talk about these kinds of cases in general, just to sort of address some of the misconceptions they have about how these cases are litigated. Why, in almost every single case, and we've cited to it in the district court and on appeal, why these settlements are typically claims made settlements. Your Honor heard the appeal on Grodziski. In Wollin v. Jaguar, the court said that when you have an action involving undisclosed alleged defects, you're going to have a class where a majority of the class won't have the symptoms manifest. Maybe a small portion of the class will have the symptoms manifest. That's okay. That's perfectly fine in a litigation class. In these kinds of cases, what happens is you're alleging that the defect can cause either premature failure or unreasonably high failure, which could be 10%. So in a class like ours, we're going to have people who didn't have symptoms yet. In fact, the majority of the people in the class don't have symptoms yet. But the people who have symptoms, they're getting extraordinary relief. They're getting cash for non-out-of-pocket repairs. These service visit payments are for money, for repairs that are not made out of pocket, which is very rare. Second, while they belittle the arbitration buyback program, the buyback program is extraordinarily valuable. If you look at their case, the Mite to Ford Touch case, all those claims are released. Here we have people who are eligible to get up to $25,000 on their cars if they have multiple hardware replacements, or if they satisfy their state's lemon law. In almost every other case, every other settlement in the district court, these claims are completely released. So we're ‑‑ the expert estimated the value of the settlement is $35 million. Opposing counsel, I thought, made the point that there was no expert estimate of the settlement amount. Well, so just in terms of the burdens, we provided an expert. They provided no valuation. It's the burden of the objector to show that the settlement is unfair and unreasonable. They provided nothing. Our expert, but again, our expert is providing a value as to the number of people who would qualify for the payments. And I want to get to another point. Full payment, aren't you, of every eligible vehicle? We are demonstrating that the settlement has considerable value. But you're assuming full payment of every eligible vehicle. Am I right on that or not? That have qualified as of the 2017 warranty data. Okay. So that was the basis of the experts. $35 million from the 2017 warranty data. One important facet of our settlement is that we have an ongoing claims period. So if someone were to ‑‑ he talks about the 180‑day approval deadline. But actually, if someone only had one service visit as of today, and then five days later, he has to go in for another visit, five days later he has to go in for another visit, that person will have ‑‑ will be eligible for cash payment under our program. That's usually cut off. In almost every other case, that's cut off. We've provided this benefit, which is actually very, very expensive for Ford and for us. Because we're going to be servicing class members for years. Let me just ask you, because it seems that in regular settlement of class certification, there's a lot of deference to the district court. And there's deference here, too, but according to our case law, we need a more searching inquiry into the fairness of the negotiations and distributions of funds, especially when we have a claims‑made process combined with a clear sailing attorney's provision. And that's present here, correct? Yes. And especially when the class ‑‑ when this does happen before certification. That's present here, correct? Yes. All right. And so I'm just trying to figure out these three pages of the district court order. How is that a searching review? And is that sufficient in light of our case law, especially Allen v. Bedolia? It's a 2015 case. And then also, well, you have Bluetooth as well. The district court's order isn't just the overruling of the objectors. It's also the final order in judgment. There's no evaluation of the handling factors in the district court order? I think under Hanlon and under NRA Online DVD, the district court, as long as you can find the considerations were made in the district court's order, that's sufficient. The circuit doesn't require poexity. What's your best case on that, to justify the order that was filed here? I would say Hanlon. Hanlon itself has a passage that says that the district court made very cursory findings. That's sufficient. Hanlon was also a precertification settlement. But it wasn't a claims made? It is a claims made settlement in that almost all car cases are. And sailing? It had the sailing provision? Well, here's the thing about car settlements. Did Hanlon have the clear sailing provision? I don't know if it did, but clear sailing provisions are common. They're routine in settlement cases. But the existence of the clear sailing provision, which is really the only item that would touch on the blue three factors, isn't sufficient to find for collusion. Especially when we have four mediations. We have the court's evaluation of the settlement, which deserves proper deference. And we have Lane versus Facebook that's quoting Hanlon. And it says approval of the proposal, which would bind class members. The court may approve it only after hearing it, only after finding it is fair, reasonable and adequate after deciding. The class representatives and class counsel have adequately represented the class. The proposed was negotiated at arm's length. And then it goes into the relief provided, the cost, risk and delay, the effectiveness of any proposed method of distributing relief to the class and method of processing class member claims, the terms of any proposed award of attorney's fees, including timing of payment, any agreement of card to be identified under Rule 23E, the proposed proposal treats class members equitably, relatively to each other. I just am not sure that the district court's analysis, it may be that this is perfectly fine agreement. Just when you compare this court order to what is contemplated in Allen and Bluetooth, and even when you compare it to Shames versus Hertz, which is a class made with clear saline, the discussion is a lot more extensive. It takes into account these reasonably calculation of the likelihood value of the settlement to the class, whether there was adequate consideration with respect to the distribution of the settlement and the attorney's fees. You just can't compare. A lot of the findings are also in the final judgment in order. But I also want to point the Court's attention to Volkswagen, which says that the Bluetooth factors are mere guideposts. The most important thing is whether or not there's a fair settlement here. There is a fair settlement. Let me just... I need to, because your time has run out, and I really want to put this question to you. On page 41 of your brief, after you belittle the argument from the objectors that 100% of the eligible class members is not the right measure, you say, quote, the district court correctly found that the value of the benefit is based on what it makes available to class members, not how much is actually claimed. But you don't say where the district court made that finding, and I couldn't find it. Where did the district court make that finding? I think the district court made a finding that the $35 million... Where did the district court make the finding that you say in your brief to this court that the district court made? The district court made a finding that the value is $35 million. It was made based on the acceptance of the expert's opinion. And since, if you look at the record, we've always represented that that value is a minimum value, a floor value, because the people are already eligible for the cash. I just want to make one final point, which is... I'm not perhaps satisfied. So I think the answer is you say the district court did not actually in hyperbole make that finding, but you think it's implicit. I'm sorry, Judge Rakoff. The standard for abuse of discretion is whether or not it's an illogical or implausible... Can't you answer my question, yes or no? My answer is that the court made a proper inference based on everything in the record to say that $35 million is a reasonable settlement. And it is because we presented it as an amount that's eligible to the class that's reasonable. Can I make one final point? A final point. The court, the objectors missed the very significant software flash payment program, which provides, whenever you take your car in to the dealer, the dealer will do a software flash. Because we have 65 different software codes. They've updated the software over and over again in this case. So you don't have to go in to the dealer for a transmission problem. It could be a tire rotation, it could be a regular checkup. They'll do a software flash, and on the third software flash payment you get $50. That covers almost every single person in this settlement class. So the idea that people are not eligible for payment under our settlement is patently false. Thank you, counsel. Thank you, Your Honors. May it please the Court, John Hacker for Ford Motor Company. I do think, Your Honor, Judge Rakoff, the court, that's what the court is saying on page ER15 when it says, furthermore, a plaintiff's expert did estimate the value of the settlement at $35 million. Their whole objection is that's what was available and that's not the right way to do it, and the plaintiff is defending that on the ground, that that is sufficient. So I think the honest answer to my question is, despite the representation in the brief, the court never made expressly the finding you say it made, but you say you think it's implicit for the reasons you just indicated. Well, first of all, it was their statement, their representation, not mine. But it's not implicit. It's what he's explicitly saying. He's saying I find well-reasoned the estimate of $35 million. That's literally what he says, and that number is the number. The point they're making, and I don't want to pursue this endlessly, but they say that he, quote, correctly found that the value of the benefit is based on what it makes available to class members, not on how much is actually claimed. That's a central issue in this case, and it would have been very helpful to have the district court's opinion on that, but we don't have the district court's opinion on that. We have the statement from the expert. We have the court simply saying, well, it's well-reasoned, and it's not so clear to me that it is well-reasoned. And that's a fair point, but I do think that the court is endorsing the $35 million. But I want to focus on that paragraph specifically because Your Honor started off with a question that the entire opinion depends on that $35 million. That's actually not quite accurate. It's the last point made in that paragraph. The main point made in that paragraph is that it is, precisely as the plaintiffs say, it is difficult to evaluate, to assess the value of a claims-made settlement, because you don't know exactly how many people are going to show up and make claims. And the point being made is that in itself. You can't just say that a claims-made settlement is impermissible as a matter of law because you can't put a dollar figure on it. That's the central point, and I think that's the principal basis for approving the settlement here, particularly where in this kind of claims-made settlement, as the court says, everybody who makes a claim is going to get paid cash payments they would not be entitled to under the Lemon Laws. And that's, I'm sorry. You can have a, you certainly can have a claims-made, and you can certainly have a clear-sailing provision. But it appears that what our law requires is a scrupulous searching review when that happens. And the question is, is this, can you cite to me a case where the analysis looks like this in a claims-made, clear-sailing provision case? I can't. I'm not saying there aren't any out there, just because I haven't looked at all the district court opinions. I've been looking. I've been looking, and I haven't. And the one that I did find is the, is it Shames v. Hertz? And the analysis here just pales drastically in comparison. I mean, taking into account all the factors and taking them to the degree that I think they're required to. And so, again, it could be that this is a perfectly fine settlement, but it has to be written in a way that it satisfies all the concerns that our case law has raised. And I can just focus on one word in your question, Your Honor, which is written. And I think that's the issue here. There does have to be a painstaking and rigorous review. And I don't think this provides evidence that that did not occur. What are you pointing to when you say this? The court's approval or decision on whether to approve. The court has to subject the proposed settlement to a rigorous review. And I think it's clear the court did that. He was presented with thorough analysis. In the document that's entitled, Order Overruling Objections to Class Settlement, it looks like it's civil minute entry. That and the judgment. Both of those are less than three pages. I take the point that his summary of the findings is not elaborate. All I'm saying is I think there's no reason to infer from that that he didn't, in fact, do the work the court requires of a district court, which is to take seriously the objections, evaluate them, explain why they're incorrect. Right. If that's the standard, then we'll never know, right? In any case, we can always say, well, even though the district judge said only five sentences, we think that he spent hours in a rigorous examination of this. I mean, that can't be the standard. Well, I think there's more than just ‑‑ I mean, first of all, it's just more than a couple sentences. But also there's the full hearing. I mean, the court did everything you expect and require of a court in taking a settlement seriously, offering objectors time, you know, taking the time needed to make the analysis. I don't think the fact that it is more summary than this panel may prefer, I accept that point. But I don't think that's a basis for throwing out the settlement or requiring further ‑‑ which is a limited review, but nevertheless a real review. We can't do it unless we have something that's written. We can't do it on the basis of just a lot of time was spent or whatever. We need something in writing or we can't do our job. I accept that, accept that. We're not talking about, for example, you know, one or two line entry after a trial where there aren't actual ‑‑ what we have is a full record. You can evaluate, look at the record that was before the judge and how he responded to and addressed the issues that were raised. And he does deal with, you know, the central points that were raised by the objectors in response to them and explains why they're incorrect as a matter of law and don't require rejection of the settlement. Your Honor seems to have a question. I don't want to put too much emphasis on the length of pages, but I do think that it has to adequately address some of these issues that are valid regarding the reasonable calculation of the value of the settlement to the class, the attorney's fees, the distribution of the settlement. And there's been some serious questions raised, and I'm just not sure from what I've seen that that is sufficient. I appreciate it.  I think did do, starting with what I already mentioned, the claims made. A principal argument is that by God we need a number. And the plaintiffs, the settling parties didn't give him a number to compare the value of the claims. Where's the number? And he responded to that directly and said you don't need that in a claims made settlement because it doesn't even make sense. And when you say the full record, are you talking about the fairness hearing? What are you talking about? Yes. There's a full briefing, full oral testimony. So that's his answer on the claims. And that's either a legitimate answer or it's illegitimate. He can't spend more sentences explaining why in a claims made settlement you don't need a hard number. He ends up by saying anyway, we do have a number here, but that's the secondary point. So I think he sufficiently responds to their main argument. The prior paragraph, Your Honors, responds to the other main argument, which as Your Honor put it was the distribution of the settlement, that it was unfair to the former owners who weren't getting recovery under the current terms of the settlement. That's just simply incorrect. And he correctly points that out. Every single former owner in the class is entitled to a cash payment on the same terms as everybody else in the class. Yeah, but isn't it relevant that that at least preliminarily appears to be only 6% of the class? As to the existing? Yes. Well, but that's because that's the only number of people who have three service visits. Nobody in the class who has less than three service visits, they've had their cars fixed. I mean, just so I understand the argument, if we had, this is not this case, it's just a hypothetical, we will pay in this settlement cash to every single member of the class who satisfies the following 2400 requirements. There is actually only one person in my hypothetical who satisfies the 2400 person, but it doesn't matter. We'll approve it anyway because everyone is in theory eligible. That can't be the law. Right, and that's nothing at all. I mean, that proves the point. That's nothing like what happened here. There's two components to the program, and they would love for the court to ignore the most important part. The first part is the cash payments. We're just making a service visit for your inconvenience. That is a remarkable and very rare component of a claims-made auto settlement. That's just saying you made a service visit. Here's money for your inconvenience, all right? Literally 100% of the class who has a claim, a Lend-in-Law claim under state law, is still going to be able to assert that claim. None of them are released. Not one. All right, that's what this settlement is. Now, given that fact, it's just incoherent to say, how do we value the settlement? Because everybody who has a claim is going to bring their claim. Now, it's going to be an arbitration, sure, but it's going to be expedited. They're going to get their money if they're entitled to it a lot faster, and they're going to get it on terms that's much more generous than the state law claims they would bring. They can bring, it's based on six years or 50,000 miles of repeated repairs, whereas under Lend-in-Laws, as the plaintiffs went through painstakingly and showed, in almost all of the states, it's like one or two years if you have four service visits within one or two years, or like 12,000 miles, a much more generous program. So you can still recover under your Lend-in-Law, the state, and if you can't, you're going to recover anywhere, anyway, if you recover under the default program. So the whole idea of evaluating the value of the settlement from that perspective is just sort of a non sequitur to start with. Counsel, I just had a question. When this matter was being presented to the district court, was any objection made to the plaintiff's expert on the basis of an assumption of 100% claims made? Was that objection raised in the district court? To the expert? I don't know the answer to that. I mean, the number was put in, but again, that's not, it's not even, as counsel pointed out, that's not even 100% in any meaningful way. That argument's been made here today, so I was just curious whether or not that specific argument was made when the expert testimony was presented. And the answer is I don't know. The record will show it. If I could just very briefly address the question of the fraud claims and the $75,000 offers that are made under California law. That is completely misleading because the reason for the $75,000 offer, and it's shown in the record at SCR 21 and 61, the reason that exists is attorney's fees. The plaintiffs, the claimants here are going to get $20,000, $25,000 for their cars. That's all any of them are going to recover through the buyback program. The $75,000 is explained by the fact that in civil litigation it takes a year to get there, and the plaintiff's lawyers accrue fees, and they get them under Lemon laws. And that's why it makes sense for Ford to make that kind of offer. It tells you literally nothing about the value of this settlement to the actual car owners. Lemon lawyers are not class members. It's all about the value to the car owners. What are the car owners going to get? They're going to get the same claim they already have except better under the arbitration. And any of them who have service visits, more than two, are going to get cash payments they wouldn't be entitled to under their own state laws. This is a completely generous and virtually unprecedented program that ought to be approved. All right. Thank you, Counsel Roboto. Thank you. Thank you. Your Honor, I know I have very little time on rebuttal, but yes, the objection was made during the fairness hearing about the expert declaration assuming a 100 percent claims rate. Where is that in the record? It is in the transcript of the fairness hearing. I don't have the page right in front of me, but it's clearly in there. We explained that to the judge about how you need to have a realistic claims rate. So that was made. It is in the transcript. The reason it is not in our written objections is because they didn't put in the expert declaration until after our written objections went in. So we did raise it at the fairness hearing, and there was a colloquy with the district court about that. So that was certainly raised. I wanted to address, Judge Rawlinson, your question about the $35 million estimate. I want to be clear, that is an estimate of the value of the settlement, the cash payment provision of the settlement, based on a 100 percent claims rate. One of the points I had made is there was no evidence of the value of the claims if the case was successful. And so I think that is an important distinction. There was one estimate about the value of the settlement, and we think it has to be discounted for claims rate. There was no evidence about the value of the claims. That sort of brings me to the point about the $75,000. In fact, that is for buyback plus two times that amount in civil penalties. The attorney's fees and costs would be on top of that. So we disagree with the last point made by Ford's counsel. And finally, with respect to the software flashes, again, there was no evidence about the number of people who would qualify based on software flashes. And if, in fact, Ford has warranty data that shows who got these software flashes when, then why is there a claims process at all? Why can't they simply send out $50 checks based on three or more software flashes? So I believe my time is up. Yeah, you've exceeded your time. Thank you, counsel. Thank you to all counsel for your arguments. The case is argued and submitted for decision by the court.
judges: Rawlinson, Murguia, Rakoff